UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

----------------------------------------------------------x

NEW YORK CITY DEPARTMENT OF      :
EDUCATION,                       :
                                 :
                    Plaintiff,   :      MEMORANDUM
                                 :      AND ORDER
          -against-              :      10-CV-05120 (JG) (JO)
                                 :
V.S., a minor child with a disability, and D.S.,  :
his mother and guardian,         :
                                 :
                    Defendants.  :

----------------------------------------------------------x

A P P E A R A N C E S

        NEW YORK CITY LAW DEPARTMENT
                100 Church Street
                Room 2-195
                New York, New York 10007
        By:     Janice L. Birnbaum
                *Attorney for Plaintiff*

        MAYERSON & ASSOCIATES
                330 West 38th Street, Suite 600
                New York, New York 10018
        By:     Gary S. Mayerson
                Brianne Nicole Dotts
                Tracey Spencer Walsh
                *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        The New York City Department of Education ("DOE" or "department")

brings this action pursuant to the Individuals with Disabilities Education Improvement

Act, 20 U.S.C. § 1400, *et seq*. ("IDEIA").  The action concerns the obligations of the

DOE stemming from the IDEIA's mandate to provide defendant V.S. with a free

appropriate public education for the 2009-2010 school year.  V.S., who has been

diagnosed with autism, attended the Rebecca School, a private, for-profit school, during

1

the 2008-2009 school year. In May 2009, the DOE developed an individualized education program ("IEP") for V.S., which provided for his placement in a special class for severely disabled children. The class was to be located in the building that houses PS 268, a general education school. According to D.S., V.S.'s mother, the IEP failed to offer a free appropriate public education. She therefore re-enrolled V.S. in the Rebecca School for the 2009-2010 school year and requested a hearing before an Impartial Hearing Officer ("IHO") to challenge the proposed IEP. On April 5, 2010, the IHO issued a Findings of Fact and Decision ("IHO decision"), in which she agreed with D.S. that the proposed IEP for the 2009-2010 school year did not provide V.S. with a free appropriate public education. The IHO concluded that the Rebecca School was a proper placement for V.S. and awarded D.S. a tuition reimbursement and prospective payment for the Rebecca School tuition. On May 5, 2010, the DOE appealed the IHO decision to a State Review Officer ("SRO"). In Appeal Decision No. 10-041, dated July 7, 2010 ("SRO decision"), the SRO concluded that the DOE would be liable for V.S.'s 2009-2010 tuition regardless of the appeal's outcome. He therefore declared the action moot and dismissed the DOE's appeal without ruling on the merits.

Both parties argue that the action is not moot. The DOE seeks a vacatur of the SRO's decision and a remand to the agency for a decision on the merits. In the alternative, it asks me to enter judgment on the merits in the DOE's favor. Defendants cross-move for a judgment affirming the IHO's determination on the merits. For the reasons stated below, I conclude that the present action is not moot. I decline to remand to the SRO and affirm the IHO's determination on the merits.

BACKGROUND

A.    *The Statutory Framework*

The IDEIA – the most recent reauthorization of the Individuals with Disabilities Education Act ("IDEA") – provides federal funds to states that provide a free appropriate public education to all children with disabilities.  20 U.S.C. § 1412(a)(1)(A). "The 'free appropriate public education' mandated by federal law must include 'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).  Special education services are administered pursuant to an individualized education program, or "a written statement for each child with a disability," that sets out the child's educational performance and goals and the services that will be provided to enable the child to meet those goals.  20 U.S.C. § 1414(d)(1)(A); *Schaffer v. Weast*, 546 U.S. 49, 53(2005).  The IEP is developed collaboratively by the child's parents, educators and representatives of the local education agency, among others.  20 U.S.C. § 1414(d)(1)(B); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  A new IEP must be implemented each year.  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).

The IDEIA "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130, but the courts have developed standards to determine what the statute requires.  To provide a FAPE, an IEP must "be sufficient to confer some educational benefit upon the handicapped child,"

3

but the statute does not require "the furnishing of every special service necessary to maximize each handicapped child's potential[.]" *Rowley*, 458 U.S. at 200, 199. "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra v. Pawling Cent. Sch. Dis.*, 427 F.3d 186 (2d Cir. 2005) (quotation marks omitted).

Although it does not explicitly set out substantive requirements, the IDEIA "provides a variety of 'procedural safeguards with respect to the provision of a free appropriate public education' by school districts." *Mackey ex rel. Thomas M. v. Bd. of Educ*, 386 F.3d 158, 160 (2d Cir. 2004) (quoting 20 U.S.C. § 1415(a)), *supplemented*, 112 F. App'x. 89 (2d Cir. 2004). "To meet these obligations and to implement its own policies regarding the education of disabled children, New York has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." *Gagliardo*, 489 F.3d at 107 (quotation marks and brackets omitted) (citing N.Y. Educ. Law § 4402(1)(b)(1)). A CSE developing a child's IEP is required to consider four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Id*. (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ww)(3)(i)).

Once an IEP is developed and proposed, a parent may challenge it before an IHO appointed by the local board of education. N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(f) (setting forth requirements for impartial due process hearing and allowing state to determine whether hearing is conducted by state or local educational

agency).  Either the parent or the school board may appeal an adverse decision by the IHO to an SRO.  N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. § 1415(g) (requiring availability of appeal to state educational agency if initial due process hearing is conducted by local educational agency).  As required by the IDEIA, the SRO's decision may be challenged in either state or federal court.  N.Y. Educ. Law § 4404(3); 20 U.S.C. § 1415(i)(2)(A).

In addition, a dissatisfied parent may unilaterally place her child in a private school and seek reimbursement from the state for the expense of educating the child privately.  *School Committee of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); 20 U.S.C. § 1412(a)(10)(C).  "In determining whether the parents are entitled to reimbursement, the Supreme Court has established a two part test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs."  *Gagliardo*, 489 F.3d at 111-12 (citing *Burlington*, 471 U.S. at 370; *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir. 2006), *cert. denied*, 552 U.S. 985 (2007)).  A district court may also consider equitable factors in determining whether to order reimbursement for private placement.  *Id.* at 112 (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993)).  A parent who determines that a proposed IEP is unsatisfactory and unilaterally places her child in private school usually "do[es] so at [her] own financial risk," as a parent generally cannot obtain reimbursement for a private school placement where the courts ultimately determine that the proposed IEP was appropriate.  *Burlington*, 471 U.S. 374.

However, in some circumstances, parents are entitled to reimbursement for private school placement pending the outcome of a challenge regardless of an IEP's

adequacy.  The IDEIA's "stay put" provision, 20 U.S.C. § 1415(j), provides that during

the pendency of any proceedings challenging the appropriateness of a proposed IEP,

"unless the State or local educational agency and the parents otherwise agree, the child

shall remain in the then-current educational placement of the child[.]"  This provision

aims to preserve public funding for an educational placement "consented to by the parent

before the parent requested a due process hearing.  To cut off public funds would amount

to a unilateral change in placement, prohibited by the Act."  *Mackey*, 386 F.3d at 163

(quoting *Zvi D. v. Ambach*, 649 F.2d 904, 906 (2d Cir. 1982)).  Therefore, regardless of

the merits of the parent's challenge to an IEP, *id.* at 161, a state must continue to fund the

child's last agreed-upon placement unless and until a new placement is established,

which occurs when (1) the parents and the state agree on a new placement, *see* 20 U.S.C.

§ 1415(j); 34 C.F.R. § 300.518(a); (2) an SRO decision "agrees with the parents that a

change of placement is appropriate," *Mackey*, 386 F.3d at 163 (quoting 34 C.F.R. §

300.514(a), (c); 34 C.F.R. § 518(d)); (3) an administrative decision agreeing with either

the parents or the state goes unappealed, 34 C.F.R. § 300.514(a); *Bd. of Educ. v. Schutz*,

290 F.3d 476, 484 (2d Cir. 2002); or (4) a court upholds a change in placement, *Schutz*,

290 F.3d at 484.  *Student X v. N.Y. City Dep't of Educ.*, No. 07-CV-2316 (NGG) (RER),

2008 WL 4890440, at *20  (E.D.N.Y. 2008).

B.     *Factual Background*[1]

1.     *The Proposed IEP*

V.S., who was nine years old in the summer of 2009, is classified as autistic.  His reading skills are at a first-grade level, and he has basic math skills.  During the 2008-2009 school year, V.S. attended the Rebecca School pursuant to an unappealed IHO decision dated December 9, 2008, which found that D.S. was entitled to tuition reimbursement for her son's placement at the Rebecca School that year.  (Tr. 6-9; SRO Dec'n 1 n.1.)  On May 20, 2009, the DOE convened a CSE to develop an IEP for V.S. for the 2009-2010 school year.  The team was comprised of D.S.; DOE District Representative and special education teacher Feng Ye; psychologist Rose Fochetta; the Rebecca School social worker; V.S.'s special education teacher at the Rebecca School, Carter Swope; a parent member[2]; D.S.'s educational advocate; and a friend of D.S.

A neuropsychological evaluation of that had been conducted in July 2008 was available to the CSE.  (School Dist. Ex. 3, ECF No. 11-4, at 21-24.)  It reported that V.S. had poor motor skills, as well as "significant linguistic and social pragmatic difficulty . . . marked functional communication difficulty, and a poor attention span, as well as heightened level of frustration."  His imitated language, "which reflects over-learned responses, is better than his more spontaneous production from the standpoint of both structure and length."  The evaluator, Dr. Herman N. Davidovicz, who has a Ph.D in clinical neuropsychology, recommended that V.S. be placed "in a program designed

---

[1]     Unless otherwise noted, the facts as stated in this section are taken from the parties' 56.1 statements and are undisputed.  Citations to "Tr." are to the administrative record, filed on February 18, 2011 as ECF docket number 11-6 through 11-11.

[2]     Pursuant to New York Education Law § 4402(1)(b)(1)(a)(viii), the committee responsible for developing an IEP must include "an additional parent, residing in the school district or a neighboring school district, of a student with a disability[.]"  This additional parent is referred to as a "parent member."

specifically for youngsters on the Autistic spectrum," meaning "a very small, structured, and sheltered setting, with a small pupil to teacher ratio, and staff trained to work with youngsters on the Autistic spectrum." (*Id.*)

By letter dated June 8, 2009, the DOE provided D.S. with final notice of its IEP recommendation. It proposed a "special class," one composed entirely of students with disabilities, with a ratio of six students to one special education teacher to one paraprofessional (*i.e.*, a 6:1:1 ratio, or a 3:2 student-to-adult ratio), with two hours weekly of occupational therapy, two and one-half hours weekly of speech and language therapy, and one and one-half hours weekly of physical therapy. Swope had instead recommended a class with a student-to-adult ratio of 2:1. The class offered in the IEP was in school P9 in District 75, which serves students with moderate to severe disabilities. P9 is comprised of seven special classes located on two floors of a building that otherwise houses a general education school, PS 268.

2. *D.S.'s Rejection of the Proposed IEP and V.S.'s Unilateral Placement*

On June 23, 2009, D.S. visited the recommended program. The following day, she wrote to the DOE to say that she was unsatisfied with the proposed placement. She explained her specific objections to the placement and stated that, because V.S. required year-round schooling and the 2009-2010 school year would begin for him on July 1, 2009, she would maintain him at the Rebecca School and seek tuition reimbursement unless the DOE proposed a new, appropriate placement for V.S. by then. D.S. received no response to her letter. (Tr. 444.)

Meanwhile, on May 12, 2009, D.S. had signed an enrollment contract with the Rebecca School for the 2009-2010 school year. (Parent's Ex. DD, ECF No. 11-3, at

11-12.)  In two installments, on May 12 and June 9, D.S. paid a deposit of $8,000, of which all but $2,500 would be refunded if the DOE offered V.S. a satisfactory public school placement.  (Tr. 434-35.)  D.S. made a further payment of $15,725 on August 20. (Parent's Ex. FF, ECF No. 11-3, at 15-17.)  D.S.'s income had not exceeded $26,000 in the previous two years.  (Parent's Ex. CC, ECF No. 11-3, at 10; Tr. 445-47.)  She receives $150 per week in child support, and pays $150 per week for two hours V.S. spends working with a special education teacher in an occupational therapy sensory gym each Saturday.  (Tr. 450-51.)  She does not seek reimbursement from the DOE for this expense.

        3.        *The Initiation of Administrative Proceedings*

On July 1, 2009, D.S. filed an impartial hearing request.  She objected to the proposed IEP on both procedural and substantive grounds.  Procedurally, D.S. complained that the CSE was improperly constituted, the goals and objectives set out in the IEP were not developed at the May 20, 2009 meeting, the proposed IEP was not timely made, and D.S. was deprived of a meaningful opportunity to participate in the placement process because the CSE did not recommend a specific placement at the May 20, 2009 meeting and because the CSE ignored D.S.'s expressed concerns about the proposed placement's inappropriateness.  Substantively, D.S. objected that the goals and objectives in the proposed IEP did not reflect all of V.S.'s educational, social and emotional needs, the teaching methodology at P9 was inappropriate, the size of the school building in which P9 was located was inappropriate, and the classroom behavior management plan was inappropriate.  (Letter Requesting Hearing, July 1, 2009, Tr. at

Parent Ex. A1-A5.)  On July 29, 2009, IHO Jean Marie Brescia issued an order directing the DOE to pay V.S.'s Rebecca School tuition during the pendency of the case.

4.  *The Administrative Hearing*

a.  *The Proposed Public School Placement*

At the impartial hearing Janet Lee, the assistant principal of P9, testified that when a new student enters P9, he is evaluated and the curriculum is adapted to meet his needs.  An appropriate classroom placement is decided by a team of classroom teachers, cluster teachers, related services providers, and sometimes the school nurse.  The class that was recommended for V.S. contained five students, who were nine or ten years old, who were in third, fourth, and fifth grades, and whose functioning levels ranged from pre-kindergarten to first grade in reading and math.  Beginning in the fall of 2009, V.S.'s class would have had six students whose math and reading levels ranged from pre-primer to grade 4.5.  (Tr. School Dist. Ex. 8.)

Lee testified that Molly Bornstein would have been V.S.'s classroom teacher in July and August 2009, and that she would have been assisted by two classroom paraprofessionals and a one-to-one paraprofessional.[3]  Both Lee and Bornstein testified that V.S. would have received a free appropriate education at P9, where the staff could help him achieve the goals set out in his IEP.  However, Bornstein also testified that, while she personally ensures that the students in her class receive mandated services, "there are some times when students don't get their services perhaps."  (Tr. 333.)

Borenstein is trained in the applied behavioral analysis methodology and the treatment and education of the autistic and related communication of handicapped

---

[3]  During the regular school year, Borenstein works as a cluster teacher, teaching science to the children in every classroom.  Tr. 301, 306-07.

children ("TEACCH") methodology, and she uses both methodologies in her classroom. Bornstein testified that she would have assessed V.S. when he entered her class, and that his academic functioning would have been in the middle of the other students in the class. In September 2009, Bornstein would have been replaced by Hannah Opsfeld. Bornstein testified that she did not speak to Opsfeld about the students in the class, because most of them would move to a different class, and Opsfeld would be teaching mostly new children. (Tr. 369-70.) It would likely have taken V.S. some time to adjust to having a new teacher and classmates in the fall.

Students at P9 receive physical therapy, occupational therapy, and speech and language therapy. Their curricula, which include reading, math and science, are based on New York State curricula and are adapted for early learners using a multi-sensory approach. Classrooms are equipped with sensory equipment that is incorporated into the students' experience as needed. Lee testified that if V.S. needed a behavior intervention plan, the school would have worked to develop one. She also said that the school could have sought the assistance of a DOE autism coach if needed. P9 has a physical therapist and an occupational therapist on staff, who work with students individually throughout the day, both in and out of the classroom, and on a scheduled and as-needed basis. The related service providers speak with the students' classroom teachers as well as Lee about student progress and classroom techniques. When service providers believe that a student's educational goals should be modified, they contact the parent to discuss amending the student's IEP.

Meal times at P9 are instructional. At breakfast and lunch, students practice communicating their choices to the adults, using utensils, and pacing their meals.

Most of P9's thirty-member staff supervise the students during lunch in the cafeteria. Speech therapists are available to assist students with feeding. Feeding coaches are also available if necessary. Special education students share the cafeteria with general education students from PS 268 at lunchtime. (Tr. 128-135.) Lee testified that if the cafeteria is too noisy for a student, she can provide him with headphones or allow him to eat lunch in another room. At other times, a child who needs quiet time may go to a spot in his classroom where he can wear headphones to listen to music or block out all sounds. Bornstein explained that when a child in her classroom needs to calm down, she might take him to an area of the classroom away from other children, wait for him to calm down, and give him a reward for calming down; she might take him to the physical therapy room; or she might put on some music for him to listen to. (Tr. 390-91.) D.S. testified that she visited the physical therapy room at P9 during the summer of 2009. She saw bleach and other chemicals on a low shelf that her child could reach, which disturbed her because V.S. has pica, meaning he puts non-food items in his mouth and ingests them. (Tr. 440-41.)

During her visit, D.S. spoke to a speech therapist, who was unable to report how many occupational and physical therapists would be at the school during the 2009-2010 school year and was uncertain whether P9 would have its own gym. (Tr. 441.) P9 also does not have a separate speech therapy room. (Tr. 441.) Music and art therapy are not provided at P9, but teachers incorporate music and art into their academic instruction, in order both to teach and to calm the students. Bornstein testified that she makes up songs and sings them to her students because "[i]t somehow calms them down and I like it." She also incorporates art into her lessons because it teaches children to feel

comfortable with new textures and "any way of expressing themselves is really very good for them" and "[c]utting, pasting . . . is something they should know."  (Tr. 391-92.) During the summer, students may participate in off-site tennis and golf programs.  The summertime is generally more relaxed at P9, because there are fewer students than during the academic year, which according to Lee makes the summer an ideal time for a student like V.S. to transfer into the school.

        b.     *The Rebecca School Placement*

The Rebecca School is a for-profit school with 109 students between the ages of four and eighteen, all of whom have neuro-developmental delays in relating and communicating.  The Rebecca School employs a developmental individual difference relationship ("DIR") teaching methodology, which focuses on helping children progress through nine developmental levels, developing their sensory processing, and improving their relationships with others.   (Tr. 170-72.)  Tina McCourt, the Rebecca School's program director, described the differences between the TEACCH and DIR methodologies.  She explained that the TEACCH methodology is focused on instruction and reward designed to encourage certain behaviors through external prompts and reinforcement, while DIR is designed to induce desirable, self-initiated responses. McCourt explained that DIR better helps students to generalize what they learn, while TEACCH is more rote.  (Tr. 175-77.)  She testified that DIR is particularly appropriate for V.S. because he is not spontaneous and needs to be taught to deviate from scripts and to initiate interactions and engage in creative thought.  (Tr. 178-82.)  She also testified that V.S. had responded well to the DIR method.  (Tr. 182-83.)

Each week at the Rebecca School, V.S. received physical therapy, occupational therapy, music therapy, and art therapy. (Tr. 184.) McCourt testified that these services included those mandated in the IEP plus art and music therapy. (Tr. 184.) V.S. responded well to the art and music therapy. McCourt testified that art and music therapy help V.S. to self-regulate, which is necessary for him to make educational progress. (Tr. 185-89.) Swope also testified that art and music therapy re beneficial to V.S.; art therapy allows him to develop a skill and focus on meeting goals in a one-on-one setting, while music therapy has taught him to become more flexible so he can adapt to change and unpredictability. (Tr. 216-18.)

V.S.'s class had a ratio of eight students to one special education teacher to three teacher assistants, although in July 2009, only seven students were in the class. Swope was V.S.'s teacher in both the 2008-2009 and the 2009-2010 school years, but she was replaced by a substitute teacher for most of July. In September 2009, there were again eight students, six of whom had been in the class during the summer of 2009. All of the students were boys diagnosed on the autism spectrum. McCourt testified that an 8:1:3 ratio was appropriate for V.S., because he needed adult support to interact with his peers. She also testified that having a larger number of students in the classroom while maintaining a 2:1 adult-to-student ratio allowed for different types of interactions. (Tr. 191-92.) Swope also testified that a 2:1 ratio is better for V.S. than the DOE's proposed 3:1 ratio because he learns best in a one-on-one setting, where he can benefit from more adult attention before transferring what he's learned to the group. (Tr. 212-15.) He also frequently needs to be removed from the classroom because he is very sensitive to noise. (Tr. 214-216.)

V.S.'s educational plan at the Rebecca school was developed by his teacher and teacher assistants, a psychologist, a physical therapist, an occupational therapist, a speech and language pathologist, an art therapist, and a music therapist. (Tr. 175.) Every Friday afternoon, this team met with V.S.'s mother in order to keep her informed about her child's education and to teach her how to work with him most effectively. (Tr. 193-95.)

5.    *The IHO Decision*

The IHO issued a decision on April 5, 2010. She found that the IEP developed for V.S. for the 2009-2010 school year did not offer him a free appropriate public education, as it was "not reasonably calculated to enable [him] to make measurable gains." The IHO determined that the 6:1:1 ratio would have provided V.S. with insufficient support and supervision, and that the location of P9 in a general education school would create sensory overload for V.S. and interfere with his learning. The IHO further determined that the Rebecca School was an appropriate program for V.S. because of its 2:1 adult-to-student ratio, its use of the DIR method, which addresses V.S.'s communication needs, and the availability of one-on-one instruction. The IHO also noted that V.S. had greatly improved his language skills, his ability to self-regulate, and his interactions with adults and peers during his time at the Rebecca School. The IHO determined that equitable considerations weighed in D.S.'s favor. D.S. was found to have cooperated with the CSE by attending the June 20, 2009 meeting, making evaluations available to the CSE, visiting the placement proposed by the DOE, and communicating her concerns about the proposed placement to the CSE. Accordingly, the

IHO directed the DOE to reimburse D.S. for any tuition she had paid to the Rebecca School for the 2009-2010 school year and to pay the remainder of the year's tuition.

### 6. *The SRO Decision*

The DOE appealed the IHO's decision to the SRO. On July 7, 2010, the SRO dismissed the appeal as moot. He noted that the Rebecca School had served as the student's pendency placement for the entirety of the 2009-2010 school year, and that the student would be entitled to funding for tuition at the Rebecca School during that time period regardless of the outcome of the appeal. Therefore, even if the SRO rendered a decision in favor of the district, the parent would be entitled to the relief she sought – public funding for placement at the Rebecca School for the 2009-2010 school year. The SRO concluded that a decision on the merits of the DOE's appeal would have no actual impact on the parties and declined to address them.

### 7. *The Present Appeal*

On November 4, 2010, the DOE filed this action. By motion dated March 5, 2011, the DOE seeks an order vacating the SRO's decision and remanding the matter back to the SRO for a ruling on the merits. In the alternative, the DOE asks me to vacate the SRO's decision and reverse the IHO's decision on the merits. The DOE argues that the IEP offered V.S. the free appropriate public education to which he was entitled, that D.S. failed to show the Rebecca School was an appropriate placement for V.S., and that the equities favor the DOE. The DOE also argues that reimbursement for tuition at for-profit schools like the Rebecca School is statutorily prohibited. On April 9, 2011, D.S. and V.S. cross-moved for an order vacating the SRO's finding of mootness and affirming the IHO's decision on the merits. Defendants argue that the IHO properly applied the

*Burlington/Carter* test for determining whether a parent is entitled to reimbursement.

Oral argument on the motions was held on June 3, 2011.

DISCUSSION

A.     *Federal Judicial Review Under the IDEIA*

Although frequently styled as Rule 56 motions for summary judgment, motions for review of a state's compliance with the IDEIA are in substance administrative appeals, not summary judgment motions. *See Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005). A district court's decision on an IDEIA appeal is not governed by the presence or absence of material factual disputes. Rather, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i).

In conducting this inquiry, the court's role is "circumscribed." *Gagliardo*, 489 F.3d at 112. "The responsibility for determining whether a challenged IEP will provide a child with an appropriate education rests in the first instance with administrative hearing and review officers." *Walczak*, 142 F.3d at 129. The IDEIA's provision of federal review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Accordingly, district courts must give "substantial deference to state administrative bodies on matters of educational policy." *Cerra*, 427 F.3d at 191. A district court should not disturb an IHO's finding concerning the appropriateness of a school placement when it is "reasoned and supported by the record."

17

*Gagliardo*, 489 F.3d at 114. However, "the 'due weight' [courts] ordinarily must give to the state administrative proceedings is not implicated with respect to [a] conclusion [that] concerns an issue of law[.]" *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997).

B.      *Whether the Case is Moot*

        Both parties urge the court to find that the SRO erred in deeming the action moot. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormak*, 395 U.S. 486, 496 (1969). Where a dispute between the parties is no longer "real and live" but has become "feigned, academic, or conjectural," an action no longer qualifies as a "case" or "controversy" within the meaning of Article III of the Constitution, and a court lacks jurisdiction to rule on its merits. *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001); *see also Powell*, 395 U.S. at 496 n.7 ("The rule that this Court lack jurisdiction to consider the merits of a moot case is a branch of the constitutional command that the judicial power extends only to cases or controversies."). "The Supreme Court has instructed that a case becomes moot only when it is 'impossible for the court to grant *any* effectual relief whatever to a prevailing party.'" *In re Boodrow*, 126 F.3d 43, 46 (2d Cir. 1997) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)) (emphasis in *Boodrow*). Therefore, as long as a party "retains some interest in the case, so that a decision in its favor will inure to its benefit," the case is not moot. *New England Health Care Employees Union, Dist. 1199, SEIU AFL-CIO v. Mount Sinai Hospital*, 65 F.3d 1024, 1029 (2d Cir. 1005).

This case is not moot because the DOE seeks redress from an alleged injury that, although collateral to the central issue in the case, is ongoing and remediable. *See New England Health Care Employees Union*, 65 F.3d 1024 (repeal of challenged legislation did not moot suit where plaintiff sought redress for collateral injury suffered when legislation was in effect). *Cf. Fox v. Board of Trustees*, 42 F.3d 135, 140 (2d Cir. 1994) (case is moot when "it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury"). The SRO was correct in concluding that funding for the 2009-2010 school year itself is no longer at issue. Pursuant to the IHO's July 29, 2009 pendency order, and in accordance with the IDEIA's stay put provision, V.S. enrolled in the Rebecca School in the fall of 2009, and the state has been required to fund his tuition at the school ever since. V.S. was educated at the Rebecca School at public expense for the entirety of the 2009-2010 school year, and the DOE will not be entitled to reimbursement for that year's tuition even if it prevails on the merits in this case. *See New York City Dep't of Educ. v. S.S.*, No. 09 Civ. 810 (CM), 2010 WL 983719, at *9 (S.D.N.Y. March 17, 2010) ("[A] school district has no right under the IDEIA to recoup pendency tuition payment from a parent."); *see also Mackey*, 386 F.3d at 160-61 ("Congress' policy choice that all handicapped children, *regardless of whether their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." (emphasis in original) (internal quotation marks omitted)).

However, while a decision in favor of the DOE will not affect its past obligations to pay V.S.'s Rebecca School tuition, it will control V.S.'s pendency placement going forward. At oral argument on June 3, 2011, the parties informed the

court that D.S. has challenged the school board's proposed IEP for the 2010-2011 school year. D.S. requested a due process hearing with respect to that IEP, the IHO found in favor of D.S., and the DOE has filed an administrative appeal of that decision to the SRO. (Letter by DOE, July 6, 2011, ECF No. 30.) During the pendency of D.S.'s challenge to the 2010-2011 IEP, V.S. has continued to attend the Rebecca School, and the DOE has continued to fund his tuition. That is because the Rebecca School is V.S.'s most recently agreed-on placement by virtue of the unappealed December 9, 2008 IHO decision finding the proposed IEP for the 2008-2009 school year inadequate. A ruling by this Court on the adequacy of the proposed 2009-2010 IEP will supplant that December 9, 2008 decision and will establish a new "current educational placement" for the purposes of 20 U.S.C. § 1415(j). Accordingly, the decision in this case will govern V.S.'s future placement until: (1) the proposed IEP for the 2010-2011 school year becomes V.S.'s current placement through an SRO decision that neither side challenges in court, an SRO decision in favor of D.S., or a final court decision in favor of either party; or (2) the parties agree on a placement for the 2011-2012 school year. Neither of these events has yet occurred. Far from being academic, a decision in this case will have an immediate, if potentially short-lived, impact on the DOE's future obligations.

C.      *Whether to Remand or Reach a Determination on the Merits*

The DOE argues that if the SRO erred in declaring the case moot, the matter should be remanded to the SRO for a ruling on the merits. The DOE acknowledges that it is within my power to decide the case on the merits, *see S.S.*, 2010 WL 983719, at *8 ("S.S. also errs when she insists that the Department lacks standing to seek review of that portion of the SRO's decision in which he refused to address the

Department's reimbursement claim. The IDEA broadly states that '*any* party aggrieved by the findings and decision made' by the SRO 'shall have the right to bring a civil action in any State court of competent jurisdiction or in a district court of the United States." (quoting 20 U.S.C. § 1415(i)(2)(A)) (emphasis in *S.S.*)), but it emphasizes that the Court would benefit from an application of the SRO's "specialized knowledge and experience" to the issues in this case, *Rowley*, 458 U.S. 176, 208. Indeed, the Second Circuit has observed that in IDEIA cases, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.

I have no doubt that a decision on the merits by the SRO would be useful. However, the drawbacks of remanding the case to the SRO outweigh the benefits, particularly where one state administrator has already provided a thoughtful opinion on the merits of the case. Other courts have reached the merits of IDEIA cases in the absence of SRO decisions. For instance, in *M.N. v. New York City Department of Education*, 700 F.Supp.2d 356 (S.D.N.Y. 2010), the parents had objected to a proposed IEP. The IHO concluded after a hearing that the IEP provided the student with a free appropriate public education, the SRO erroneously dismissed the parents' appeal as moot, and the district court, ruling on the merits, affirmed the IHO's determination. The court recognized that federal courts "are expected to give due weight" to administrative proceedings, and it applied this standard to the IHO's findings. *Id*. at 364 (quoting *Walczak*, 142 F.3d at 129) (internal quotation marks omitted); *see also S.S.*, 2010 WL 983719.

Second Circuit case law confirms that IHOs, as well as SROs, provide valuable guidance on the educational questions district courts are less well-equipped to evaluate, and that IHO determinations on these questions generally deserve deference. The Second Circuit has found reversible error where a district court afforded no weight to an IHO's findings with respect to the appropriateness of a private school placement, even where the SRO had not addressed the subject. *Gagliardo*, 489 F.3d at 113 n.2. The court emphasized that "federal courts reviewing administrative decisions must give 'due weight' to these proceedings." *Id.* at 113 (quoting *Rowley*, 458 U.S. at 206). It held that an IHO's decision might be afforded diminished weight when a subsequent SRO decision disagrees with it, but strongly suggested that an IHO determination otherwise merits equal deference. *Id.* at 113 n.2 (citing *Heather S. v. Wisconsin*, 125 F.3d 1045, 1053 (7th Cir. 1997) ("the 'due weight' which the court must give to the hearings below is . . . to the decision of the hearing officers . . . [which] is an easier task where . . . the hearing officers are in accord")); *see also A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

Accordingly, this Court appropriately defers to an IHO's determinations regarding "preferable educational methods," *Rowley*, 458 U.S. at 207, unless those determinations have been superseded by an SRO's contrary conclusions or are without support in the record. While I may remand for clarification or correction of an incorrect or unhelpful SRO decision, I need not do so when the IHO's determination offers well-reasoned and persuasive guidance. *See M.H. v. New York City Dep't of Educ.*, 712 F.Supp.2d 125, 154-55 (S.D.N.Y. 2010) (declining to defer to the SRO where his

decision was not supported by the record and instead deferring to the IHO decision, which was).

The DOE cites three cases in support of its argument that remand is appropriate, but, as the defendants point out, these three cases are easily distinguished from the one before me. In *C.B. v. Pittsford Central School District*, No. 08-CV-6462 CJS (P), 2010 WL 1533392 (W.D.N.Y. April 15, 2010), the district court remanded where neither the IHO nor the SRO had addressed the merits of the parties' claims. In *Gagliardo v. Arlington Central School District*, 373 F.Supp.2d 460, the IHO had issued a decision on the merits, but the SRO erroneously found plaintiff's claim untimely. The court cited allegations of misconduct by the IHO and remanded based on a "prefer[ence] that the State Education Department opine on [the] issue[.]" In *Carlisle Area School v. Scott P.*, 62 F.3d 520, 525-26 (3d Cir. 1995), *cert. denied*, 517 U.S. 1135 (1996), the Third Circuit held that a district court does not act improperly when it remands to an administrative appeals panel for clarification of a decision the court finds "confusing." These cases suggest that a district court *may* remand to an SRO, and that remand is appropriate where the district court has received insufficient guidance from state administrative agencies as to the merits of a case. In this case, however, have significant state guidance in the form of a thoughtful IHO decision.

The interest in the efficient administration of justice also weighs in favor of a decision on the merits rather than a remand. This case involves the appropriateness of an IEP devised nearly two years ago. Not only has the school year at issue already passed, but V.S. has completed the following school year as well. The DOE has asked me to remand the case to the SRO, but at oral argument on June 3, 2011, counsel for the

DOE urged the Court to render its decision as quickly as possible. Counsel cited the substantial burden placed on the DOE by the pendency order and expressed her client's desire to have its obligations under the IDEIA determined as quickly as possible. I find that the public interest in a determination as to whether the DOE should continue funding V.S.'s private school education will best be served by rendering a decision on the merits now. If I remand, the DOE will not be relieved of its obligation to pay V.S.'s Rebecca School tuition even if it prevails below unless and until a court finds in its favor on appeal from that decision. Furthermore, although this case is not yet moot, it likely will be soon. If an SRO renders a decision in the parents' favor with respect to the 2010-2011 school year or renders a decision and neither side seeks review, or a court renders a decision with respect to that year, or D.S. and the DOE agree to a placement for the 2011-2012 school year, any decision in this case will become moot. Remanding to the SRO will prove futile if one of these events occurs before the SRO renders a decision in this case and a court has an opportunity to review that decision. For these reasons, and because the record contains a thorough and thoughtful state administrative decision that addresses the questions of educational policy presented by this case, I do not remand to the SRO and instead address the merits of the parties' cross-motions.

D.     *Whether the* Burlington/Carter *Test Has Been Satisfied*

To determine whether D.S. was entitled to have her son's 2009-2010 placement at the Rebecca School publicly funded, I must apply a two-part test, known as the *Burlington/Carter* test, which asks: "(1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs." *Frank G.*, 459 F.3d at 363 (citing *Burlington*, 471 U.S. at 370; *Carter*, 510 U.S. at 12-13). I may

also take into account "equitable considerations relating to the reasonableness of the action taken by the parents." *Id*.at 363-64 (internal quotations and brackets omitted).

The text of the IDEIA does not allocate the parties' respective burdens of proof, but the Supreme Court has held that "the burden of persuasion lies where it usually falls, upon the party seeking relief," *Schaffer*, 546 U.S. at 56, or in this case, on the parent who seeks reimbursement. However, the Supreme Court expressly declined to address whether "States may, if they wish, override the default rule and put the burden always on the school district." *Id*. at 61-62. This question is significant in this case because the New York legislature has statutorily placed the burdens of production and persuasion on the school district for all issues in an administrative hearing except with respect to the appropriateness of a unilateral private school placement. N.Y. Educ. Law § 4404(1)(c). In light of this legislative directive, and in the absence of any contrary instruction in the IDEIA, federal courts in New York have placed the burden of disproving prong one of the *Burlington/Carter* test on the DOE and the burden of proving prong two on the parents. *See*, *e.g.*, *R.E. v. New York City Dep't of Educ.*, --- F.Supp.2d ---, 2011 WL 924895, at *13 (S.D.N.Y. March 15, 2011); *G.B. ex rel N.B. v. Tuxedo Union Free School Dist.*, 751 F.Supp.2d 552, 573 (S.D.N.Y. 2010); *see also L.K. v. Dep't of Educ.*, No. 09-CV-2266 (RMM)(LB), 2011 WL 127063, at *4 (E.D.N.Y. Jan. 13, 2011).

1.    *The Appropriateness of the Proposed IEP*

The IHO found that the DOE had failed to show that the proposed 2009-2010 IEP offered V.S. a free appropriate public education, and that D.S. had established that the Rebecca School was an appropriate placement for V.S. While the DOE objects to these conclusions, it "has not specified any legal or factual error sufficiently

compelling to outweigh the considerable deference accorded to state officials in these matters." *Garro v. Connecticut*, 23 F.3d 734, 736 (2d Cir. 1994) (per curiam). The DOE argues that a 3:1 ratio would have been appropriate for V.S., that TEACCH would have been an effective teaching methodology, and that the size and mixed-use nature of the school building and cafeteria would not have significantly disrupted V.S.'s ability to learn. The IHO came to the opposite conclusions. She found that:

> the IEP developed for [V.S.] for the 2009-2010 school year was not reasonably calculated to enable [V.S.] to make measurable gains. The 6:1:1 ratio was insufficient to address [V.S.'s] significant needs for support and supervision. The evidence establishes that [V.S.] requires a small structured setting, designed for autistic students, where he can receive constant adult supervision. . . . Furthermore, the general education school in which the self-contained 6:1:1 class would be housed would create a sensory overload for [V.S.] which would interfere with not only his learning but the learning of his classmates as well.

(IHO Decision 13.) These conclusions are supported by a preponderance of the evidence. *See Grim v. Rhinebeck Cent. School Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) ("Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence[.]" (internal quotation marks omitted)). In particular, McCourt and Swope both testified that a 2:1 ratio was necessary for V.S. because he required abundant adult supervision. Davidoicz's neurological evaluation also concluded that V.S. required a "very small, structured, and sheltered setting, with a small pupil to teacher ratio." (Tr. School Dist. Ex. 3-4.) Lee testified that P9 students share the cafeteria at meal times with general education students, and that the cafeteria can get very noisy, while Bornstein testified that there was no dedicated quiet room where she could take V.S. if he needed to calm down. A Rebecca School progress report

dated May 12, 2009 observed V.S.'s tendency to "become dysregulated in the form of crying or hitting his head in [a] loud environment" and noted the necessity to V.S. of having "the opportunity to leave the classroom if it is too stimulating." (Tr. School Dist. Ex. 5-1.) Furthermore, while McCourt testified in some detail as to why TEACCH would be unable to teach V.S. the basic skills he needs to learn, the DOE has cited no evidence that TEACCH would be an effective method for educating V.S.

Accordingly, sufficient evidence supports the IHO's conclusions that V.S. would be unable to receive educational benefits at P9, given the adult-to-student ratio, teaching methodology and physical situation of the class offered to him. Even if I were inclined to disagree with the IHO's conclusions regarding the appropriateness of the proposed P9 placement, questions of class size, teaching methodologies and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies. *See Gagliardo*, 489 F.3d 105 (finding error where the district court substituted its own evaluation of a school environment for that of the IHO). The Second Circuit has "not hesitated to vacate district court opinions where the district court 'erred in substituting its judgment for that of the agency experts and the hearing officer.'" *Cerra*, 427 F.3d at 195 (quoting *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989)); *see also Mr. P. ex rel. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008) ("Independent judicial review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" (quoting *Rowley*, 458 U.S. at 206)). Even if the DOE can point to some evidence suggesting that P9 might have provided V.S. with the "basic floor of opportunity" guaranteed by the IDEA, *Rowley*, 458 U.S. at 201, I may not

"impermissibly cho[o]se between the views of conflicting experts on a controversial issue of educational policy – effective methods of educating [autistic] students – in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *Grim*, 346 F.3d at 383.

2.     *The Appropriateness of the Rebecca School Placement*

The DOE also argues that, contrary to the IHO's determination, D.S. failed to establish that the Rebecca School placement was appropriate. D.S. bears the burden of proving the appropriateness of the private school placement, but she need not establish that the Rebecca School meets the IDEIA definition of a free appropriate public education, or that it meets state education standards or requirements. *Frank G.*, 459 F.3d at 364 (citing *Carter*, 510 U.S. at 14). However, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement." *Id.* In other words, "the issue turns on whether a placement – public or private – is 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley*, 458 U.S. at 207). The DOE contends that the record contains insufficient evidence of the Rebecca School curriculum and V.S.'s progress at the school, but the May 12, 2009 Rebecca School progress report contained in the record and testimony at the hearing before the IHO provide an abundance of evidence to support the IHO's finding that the Rebecca School was an appropriate placement for V.S.

According to the progress report, V.S.'s school day at the Rebecca School "consists of Floortime sessions, Language Arts, Math, Science, Social Studies, Visual-Spatial processing activities, Sensory activities, and Movement activities[,]" in addition

to "Occupational Therapy, Physical Therapy, Speech Therapy, Art Therapy, Music Therapy, classroom-based Drama, and Adaptive Physical Education as a part of his individualized program." (Tr. School Dist. Ex. 5-1.) The progress report details the curriculum followed at the Rebecca School for teaching V.S. math and language arts, and it documents his various achievements between December 2008 and May 2009. It records V.S.'s significant progress with respect to his academic, physical therapy, speech therapy, and occupational therapy goals. (Tr. School Dist. Ex. 5.) These indications of V.S.'s progress support McCourt's testimony that the teaching methodology, class size, and resources available at the Rebecca School are particularly appropriate for V.S. Specifically, McCourt testified that the DIR teaching methodology helps V.S. develop spontaneity and creativity, which TEACCH would not help him do. McCourt's opinions are consistent with Davidovicz's evaluation, which found V.S.'s "over-learned responses . . . better than his more spontaneous production," and recommended an educational setting with a "small pupil to teacher ratio." (Tr. School Dist. Ex. 3.) In sum, a review of "the totality of the circumstances" reveals substantial evidence that the Rebecca School more than "reasonably serves [V.S.'s] individual needs." *Frank G.*, 459 F.3d at 364. In light of this evidence – and the Second Circuit's admonition that "[a]n assessment of education progress is a type of judgment for which the district court should defer to [the administrative officers'] educational experience," *Frank G.*, 459 F.3d at 367 (quoting *M.S. v. New York City Dep't of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000)) – I affirm the IHO's conclusion that the Rebecca School was a proper placement for V.S.

3.      *The Balance of Equities*

"Even if the [parent] succeed[s] in showing that [her] private placement was appropriate . . . 'courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant." *A.D. v. Bd. of Educ.*, 690 F.Supp.2d 193, 215 (S.D.N.Y. 2010) (quoting *Forest Grove School Dist. v. T.A.*, --- U.S. ---, 129 S.Ct. 2484, 2496 (2009)).  The IDEIA specifically contemplates that reimbursement for a unilateral private school placement "may be reduced or denied" if a parent fails to inform a school district of her intent to enroll her child in a private school, fails to make her child available for an evaluation, or otherwise acts unreasonably.  20 U.S.C. § 1412(a)(10)(C)(iii).  The DOE argues that reimbursement should be denied in its entirety in this case because D.S. signed an enrollment contract with the Rebecca School for the 2009-2010 school year on May 12, 2009, eight days before the May 20 CSE meeting, and because by June 9, 2009, the day after she was notified of the school district's proposed IEP, D.S. had paid a deposit of $8,000 to the Rebecca School, $2,500 of which was non-refundable.  These facts alone do not indicate that D.S. acted "truly unilaterally, bereft of any attempt to achieve a negotiated compromise and agreement on a . . . placement." *Burlington v. Dep't of Educ.*, 736 F.2d 773, 799 (1st Cir. 1984), *aff'd*, 471 U.S. 359.

As found by the IHO, "the parent cooperated with the CSE by attending the IEP meeting, expressing her concerns at that meeting, making evaluations available to the CSE, . . . visiting the placement proposed by the Department of Education[, and] communicat[ing] her concerns about the proposed placement to the CSE."  (IHO Decision 15.)  The CSE did not issue its recommended IEP until June 8, 2009, which was less than one month before V.S.'s year-long 2009-2010 school year would begin.  The

record establishes that D.S. quickly visited the recommended program and promptly informed the DOE of her concerns. She also alerted the DOE that, given the impending commencement of V.S.'s school year, she would re-enroll him in the Rebecca School as of July 1 unless she and the DOE had agreed on an appropriate alternative. There is no indication that D.S. was at fault for the lateness of the proposed IEP and the short period of time left to the DOE to address her concerns. In light of these circumstances, it was entirely reasonable for D.S., while working cooperatively with the school district, to also preserve her options by paying a partially refundable deposit to the Rebecca School. *See R.K. ex rel, R.K. v. New York City Dep't of Educ.*, No. 09-CV-4478 (KAM), 2011 WL 1131492, at * 29-30 (E.D.N.Y. Jan. 21, 2011) (report and recommendation) ("[T]he Court rejects the [school board's] contention that enrolling [the student at a private school] prior to receiving the NFR evidences bad faith . . . given the DOE's delay in sending the NFR, the imminence of the new school year and [the parents'] need to preserve their legal rights."), *adopted*, 2011 WL 1131522 (E.D.N.Y. March 28, 2011). Accordingly, I agree with the IHO that equitable considerations do not counsel against awarding D.S. reimbursement for V.S.'s Rebecca School placement.

E.        *Whether For-Profit School Tuition May Be Reimbursed*

Finally, the DOE contends that reimbursement for tuition at the Rebecca School is barred by the IDEIA because the Rebecca School is a for-profit business. The DOE observes that the IDEIA only explicitly authorizes tuition reimbursement for unilateral placement in "a private elementary school or secondary school," 20 U.S.C. § 1412(a)(10)(C)(ii), and that the statute defines "private elementary school" and "private secondary school" to include only nonprofit schools, *id*. §§ 1401(6); 1401(27). The DOE

therefore argues that tuition reimbursement for placement in for-profit schools is statutorily prohibited.  This argument is contrary to the IDEIA's instruction that courts "shall grant such relief as the court determines is appropriate," *id*.§ 1415(i)(2)(C)(iii), to meet the statute's "broad purpose" of providing children with disabilities a free appropriate education, *Forest Grove*, 129 S.Ct. at 2490-91 (quoting *Burlington*, 471 U.S. at 369), and it defies the Supreme Court's direction to treat § 1412(a)(10)(C)(ii) as "elucidative rather than exhaustive," *id*. at 2493.

In *School Committee of Burlington v. Department of Education*, 471 U.S. at 369, the Supreme Court held that the grant of authority in 20 U.S.C. § 1415 (i)(2)(C)(iii) included the power to order public reimbursement for private school tuition, even though at that time the statute included no specific authorization for tuition reimbursement.  *See Forest Grove*, 129 S.Ct. at 2490.  The *Burlington* Court found "appropriate" relief under the statute to include payment of private school tuition where a proposed public school placement was inappropriate and private school placement was proper.  Subsequently, in *Florence County School District Four v. Carter*, 510 U.S. 7, the Court reaffirmed the availability of reimbursement, and held such reimbursement to be appropriate even where the private school in question had not been approved by the state. Congress later amended the IDEA to explicitly provide for private school tuition reimbursement in the circumstances considered by the *Burlington* and *Carter* Courts.

Specifically, 20 U.S.C. § 1412(a)(10)(C)(ii) reads:

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for

the cost of that enrollment if the court or hearing officer
finds that the agency had not made a free appropriate public
education available to the child in a timely manner prior to
that enrollment.

The Supreme Court construed this provision in *Forest Grove School District v. T.A.*, in which it rejected the argument that "Congress intended § 1412(a)(10)(C)(ii) to provide the exclusive source of authority for courts to order reimbursement when parents unilaterally enroll a child in private school." 129 S.Ct. at 2492. Instead, the *Forest Grove* Court, like the *Burlington* and *Carter* Courts, held that § 1415(i)(2)(C)(iii) conferred broad authority on federal courts to craft remedies necessary to ensure that a child's right to a free appropriate public education is complete. *Id*. at 2494-95. It therefore instructed courts to read the clauses of § 1412(a)(10)(C) as "elucidative rather than exhaustive." *Id*. at 2493. In accordance with this directive, the *Forest Grove* Court held that, despite the language of 20 U.S.C. § 1412(a)(10)(C)(ii), the IDEA permitted reimbursement for private school tuition even where a child had not "previously received special education and related services under the authority of a public agency."

In the case before me, the DOE cites no provision of the IDEIA that bars reimbursement for tuition at for-profit private schools. It relies instead on § 1412(a)(10)(C)(ii)'s contemplation only of reimbursement to "a private elementary school or secondary school," which is defined elsewhere to include only nonprofit institutions, §§ 1401(6); 1401(27). To read the IDEIA's specific authorization of certain remedies as a bar against the provision of other remedies necessary to effectuate the act's goal would be contrary to the Supreme Court precedent discussed above.

The DOE has identified no case that reads the IDEIA to categorically bar reimbursement for tuition at a for-profit school.[4]  Instead, it relies on *Arizona State Board for Charter Schools v. United States Department of Education*, 464 F.3d 1003 (9th Cir. 2006), which addressed the eligibility of various schools to receive federal grant money under the IDEA. The Ninth Circuit held that the limitation of federal grants under 20 U.S.C. § 1411 – a provision not at issue in the present case – to "elementary schools" and "secondary schools" precluded a for-profit charter school from receiving a grant.  But the permissibility of federal grants to private institutions is not at issue in this case, which concerns the right of a child with disabilities to receive an appropriate education at the state's expense.  *See Cerra*, 427 F.3d at 192 (quoting 20 U.S.C. § 1412(a)(1)(A)).  An order of reimbursement in this case would not constitute a federal grant to a for-profit school.  Rather, it would "merely require[] the [DOE] to pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington*, 471 U.S. at 370-71.  As it relates to this case, *Arizona State Board* stands only for the unremarkable proposition that "elementary school" and "secondary school" as defined in the IDEIA exclude for-profit institutions.  It does not support the DOE's argument that these definitions limit courts' power to fashion remedies necessary to "ensure that all children with disabilities have available to them a free appropriate education," and to "ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. §§ 1400(d)(1)(A)-(B).  *See Carter*, 510 U.S. at 13-14

---

[4]     The defendants, by contrast, direct the Court's attention to a recent decision by a district court in this circuit, *A.D. v. Board of Education*, 690 F.Supp.2d 193, which held that the defendant school board had waived a similar argument concerning the Rebecca School's for-profit status.  The court went on to observe that, even if the argument had not been waived, "it would not succeed because the Supreme Court has clarified that . . . 20 U.S.C. § 1412(a)(10)(C) . . . constitutes a permissive rather than an exclusive source of relief authority." *Id.* at 214 n.16.  The court also found it "noteworthy that New York's regulations implementing the IDEA explicitly contemplate placing disabled students in for-profit private schools." *Id.* (citing 8 N.Y. Comp.Codes R. & Regs. § 200.7(a)(2)(d)(2)).

(holding that reimbursement for tuition at a private school was proper even where the private school did not comply with certain of IDEA's requirements applicable in other contexts).

The DOE makes no contention, aside from its categorical argument, that reimbursing the defendants for the Rebecca School tuition would be inequitable as a result of the school's for-profit status. The DOE does not argue, for instance, that the cost of education at the Rebecca School is unreasonable. *See Carter*, 510 U.S. at 15. Accordingly, the Rebecca School's for-profit status does not deprive me of my authority to grant the relief I deem appropriate to ensure V.S. a free appropriate education for the 2009-2010 school year. In this case, where the school district's proposed IEP was not reasonably calculated to guarantee V.S. the educational benefits to which he was entitled, the Rebecca School placement was appropriate to his needs, and no equitable considerations counsel against reimbursement for that placement, reimbursement is a proper remedy, authorized by the IDEIA.

F.     *Whether Defendants Are "Substantially Prevailing" Parties*

D.S. and V.S. seek a declaration that they are the "substantially prevailing parties" in this action and seek leave to submit a fee application for statutory attorneys' fees and other recoverable costs in this action and in the administrative proceedings below pursuant to 20 U.S.C. § 1415(i)(3)(B). That provision of the IDEIA authorizes courts, in their discretion, to award reasonable attorneys' fees "to a prevailing party who is the parent of a child with a disability[.]" *Id.* § 1415(i)(3)(B)(i)(I). A "prevailing party" is "one who has been awarded some relief by the court." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001); *see also A.R. ex*

*rel. R.V. v. New York City Dep't of Educ.*, 407 F.3d 65, 75 (2d Cir. 2005) (" . . .

*Buckhannon* applies to the IDEA." (citing *J.C. Regional Sch. Dist. 10*, 278 F.3d 119, 124

(2d Cir. 2002)). A party may be a prevailing party within the meaning of the statute

"regardless of whether the party seeking fees is a plaintiff or a defendant[.]" *Mr. L. v.

Sloan*, 449 F.3d 405, 407 (2d Cir. 2006). Furthermore, a parent who prevails in

administrative proceedings under the IDEIA is a "prevailing party" who may therefore be

entitled to attorneys' fees. *A.R.*, 407 F.3d at 75. A party may prevail by obtaining a

judgment on the merits or otherwise securing a "material alteration of the legal

relationship of the parties." *Preservation Coalition of Erie County v. Federal Transit

Admin.*, 356 F.3d 444 (2d Cir. 2004) (quoting *Buckhannon*, 532 U.S. at 604 (internal

quotation marks omitted)). Defendants in this action have prevailed on the merits and

have therefore attained prevailing party status under 20 U.S.C. § 1415(i)(3)(B). They are

directed to confer on the subject of attorneys fees' in an effort to reach an agreement. In

the absence of agreement, defendants shall submit an application for fees on or before

September 16, 2011.

CONCLUSION

For the reasons stated above, the DOE's motion for vacatur of the SRO's

decision and a remand or, in the alternative, for a judgment on the merits in the DOE's

favor is denied. Defendants' cross-motion for a judgment vacating the SRO's mootness

finding and affirming the IHO's determination on the merits is granted. The defendants'

request for a declaration that they are the "substantially prevailing parties" in this action

is granted, and the parties are directed to confer in an effort to reach an agreement

concerning attorneys' fees.  If no agreement is reached, defendants shall submit a fee

application on or before September 16, 2011.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 29, 2011
      Brooklyn, New York